# EXHIBIT "1"

## IN THE DISTRICT OF MAYES COUNTY STATE OF OKLAHOMA

BILLY JACK GRAVES                          )
                                           )
    Plaintiff,                        )
                                           )
v.                                         )
                                           )    Case No. CV-2020-31
UNION PACIFIC RAILROAD,                     )
                                           )
a foreign limited liability company;       )
                                           )
LLOYD PLYMALE, individually;               )
                                           )
KELLY D. SMITH, individually,              )
                                           )
    Defendants.                       )

```
FILED IN THE DISTRICT COURT
    MAYES CO, OKLAHOMA

       SEP 2 2 2020

LAURA L. WADE COURT CLERK
BY_____ DEPUTY
```

### FIRST AMENDED PETITION

COMES NOW, the Plaintiff Billy Graves (Plaintiff) and hereby submits his first amended petition (FAP) against the Defendants. In support thereof, Plaintiff alleges and states as follows:

1.    Defendant Union Pacific Railroad (UP) is a foreign limited liability company doing business in Oklahoma; including Mayes County. Upon information and belief UP is a subsidiary of Union Pacific Incorporated which is a Nebraska Corporation.

2.    Defendant Lloyd Plymale was a supervisor of UP and engaged in numerous unlawful acts as described below.

3.    Plaintiff was employed with UP in Coffeyville, Kansas and was terminated most recently in Mayes County, Oklahoma where he was on a work assignment.

4.    Plymale is a citizen of Oklahoma and resides in Nowata County.

5.    Plaintiff is a citizen of Oklahoma and resides in Rogers County, Oklahoma.

6.    Plaintiff was terminated in Mayes County, Oklahoma.

1

7.    Plaintiff files this FAP[1] pursuant to 12 O.S. § 2015 which allows for amendment before a responsive pleading-an Answer-is filed. That

8.    Plaintiff has been a faithful employee of the Union Pacific Railroad for over 15 years.

9.    Defendant Kelly D. Smith (Smith) is a supervisor employed with UP.  Specifically, Smith is an Assistant Manager of Operating Procedures.

9.    Smith is a citizen of Kansas.  Smith resides in Coffeyville, Kansas.

10.    Plaintiff was employed with UP assigned to the Coffeyville, Kansas yard which included assignments throughout Oklahoma but generally in Northeast and Southeast Oklahoma.

11.    Plaintiff was a party to a prior lawsuit filed in the Northern District of Oklahoma, styled as: Richard Adamson and Billy Graves v. Union Pacific Railroad and Lloyd Plymale, Case No. 18-CV-432-CVE-JFJ (prior case), *See* Complaint, attached hereto as Exhibit 1.  A notice of settlement was filed in the prior case on November 20, 2019 and a joint stipulation for dismissal with prejudice was filed on December 20, 2019.

12.    Plaintiff had previously been fired by UP and through his collective bargaining process was reinstated.  Thereafter, Defendants began to retaliate against Plaintiff.

13.    Plaintiff was working and on duty on August 14-15, 2018.

14.    Plaintiff began his shift at approximately 10:00 p.m. on August 14.

15.    Plaintiff was on a crew and the Footboard Yardmaster, Rich Adamson, (Adamson) oversaw a small crew of workers.  Adamson was a co-plaintiff in the prior case.

16.    During Plaintiff's shift in the early morning of August 15, 2018, visible lightning was observed. The lightning was severe lightning in the area and Plaintiff and the rest of the crew

---

[1] An amended petition supersedes the original petition. *See Pacific Bell Tel. Co. v. Linkline Communications, Inc.,* 555 U.S. 438, n.4 (2009); *Miller v. Glanz,* 948 F.2d 1962, 1965 (10th Cir. 1999).

was concerned for their safety. Specifically, the lightning was sky to the ground lightning and the forecast called for this lightning to continue for a few hours.

17.     Plaintiff was directed by his supervisor, Adamson, to leave due to safety concerns. The crew tied up all equipment and ended the shift early due to such safety concerns.

18.     Plaintiff had never before had to request permission to leave and tie up due to dangerous weather. Moreover, Plaintiff received no monetary benefit from leaving early, his pay was the same regardless.

19.     The next day, Plaintiff was terminated due to a decision of Defendant Smith.

20.     On August 28, 2018, Plaintiff appeared pursuant to a "Notice of Investigation" and an administrative hearing was conducted, and Smith appeared as a witness and provided numerous false testimony against Plaintiff to satisfy his agenda of retaliating against Plaintiff.

21.     On August 13, 2018, the day before Smith unlawfully terminated Plaintiff, Smith was overheard stating that he was going to fire the nighttime thieves who stole the gloves. This was in reference to the prior lawsuit wherein both Adamson and Graves were accused of stealing gloves-gloves needed for safety issues. Graves was unlawfully terminated previously and won his job back all as set forth in the prior action. Thus, it is clear that Defendants were planning on firing Plaintiff.

22.     Plymale's animus towards Plaintiff was documented in the prior suit. Moreover, Plymale continues to display his animus by driving past the residence of the co-plaintiff in the prior case and flipping him the middle finger[2].

23.     Smith's statement that he was going to fire the thieves, though a false classification, proved to be prophetic as he fired Plaintiff as well as the co-plaintiff in the prior action.

---

[2] Flipping the middle finger is an obscene hand gesture and is roughly equivalent to "f*ck you." "Middle Finger," Wikipedia, https://en.wikipedia.org/wiki/Middle_finger

24.     On August 28, 2018, Plaintiff appeared pursuant to a "Notice of Investigation" and an administrative hearing was conducted.

25.     In September of 2018 UP gave Plaintiff his job back before a decision was reached at his administrative hearing.

26.     On April 24, 2019 Plaintiff was again terminated by UP.  He was terminated in Mayes County, Oklahoma.

27.     A hearing was had on April 24, 2019 pursuant to a "Notice of Investigation" dated April 17, 2019.

28.     On July 11, 2019 UP attempted to condition reinstatement of Plaintiff upon his signing a waiver of all claims.  *See* proposed release of July 11, 2019 attached as Exhibit 2.  Plaintiff did not sign the coercive proposed release.

29.     On July 17, 2019 UP reinstated Plaintiff but did not provide him back pay and further placed him on probation and adversely placed such status in his personnel file.

30.     That Oklahoma law applies to this proceeding based on having the most significant relationship to the parties and this action and pursuant to the agreement of the parties that Oklahoma law is controlling.

## COUNT I.     BURK TORT-DISCHARGE IN VIOLATION OF OKLAHOMA PUBLIC POLICY (AS TO DEFENDANT UP)

Plaintiff restates and re-alleges the foregoing as though fully set forth herein. Additionally, Plaintiff alleges:

22.     Plaintiff was terminated in retaliation for his filing of the prior suit and the assertion of his right of access to the courts as well as his reporting of unsafe working conditions.

23.     UP placed unreasonable terms and conditions on Plaintiff, such as continuing to work with hostile supervisors and continuing to retaliate against Plaintiff.

4

24.     The termination of Plaintiff is in violation of the public policy of the State of Oklahoma and is actionable pursuant to *Burk v. K-Mart,* 1989 OK 22, 770 P.2d 24 and its progeny.

25.     Plaintiff was terminated in retaliation for exercising his right of access to the courts recognized by art. 2 § 6 of the Oklahoma Constitution; *Zeier v. Zimmer, Inc.,* 2006 OK 98, ¶ 3, 152 P.3d 861. Plaintiff engaged in legally protected conduct by filing a lawsuit against UP based on matters of public concern, specifically based on retaliation for reporting unsafe working conditions.  Further, Plaintiff was retaliated against for protecting his workers from lightning and such is obviously protected by public policy as well.

26.     Plaintiff's termination was significantly motivated by reasons that violate Oklahoma public policy, Specifically, the right of redress from the courts.  *Groce v. Foster* 1994 OK 88, ¶ 9. 880 P.2d 902; *Turner v. Reynolds Ford, Inc.* 145 F.3d 1346 (10th Cir. 1998).

27.     As a result of UP's conduct, Plaintiff has sustained actual damages in excess of $10,000.00.  Further, Plaintiff should be awarded equitable, injunctive and declaratory relief in the form of front pay, back pay, reinstatement and UP should be enjoined from continuing to engage in the conduct described herein.

28      Plaintiff should be awarded punitive damages.

## COUNT II-MALICIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP- AS TO PLYMALE AND SMITH

Plaintiff restates and re-alleges the foregoing as though fully set forth herein. Additionally, Plaintiff alleges:

29.     That Smith and Plymale were aware of Plaintiff's rights with respect to the policy and procedures of UP and Plaintiff's employee benefits.

5

30.    Moreover, Plaintiff had a contractual relationship by virtue of his employment with UP.

31.    Smith and Plymale caused UP to breach the contract with Plaintiff as set forth in the policies and procedures of UP.

32.    That Smith and Plymale acted willfully, maliciously and in bad faith.

31.    That as a result of Smith and Plymale's conduct, Plaintiff has sustained actual damages in excess of $10,000.00.  Further, Plaintiff should be reimbursed his court costs incurred herein.

32.    Punitive damages should be assessed against Smith and Plymale.

### V. CONCLUSION

WHEREFORE, Plaintiff requests an award of actual damages in excess of $10,000,00, an award of punitive damages in excess of $10,000, an award of front pay, back pay reinstatement and any other and further relief this court deems proper.

Respectfully submitted,

Brendan M. McHugh, OBA #18422
Attorney for Plaintiff
P.O. Box 1392
Claremore, OK  74018
(918) 608-0111
Fax: (918) 803-4910
Email:Brendan@lawinok.com
and
Dana Jim, OBA #19495
P.O. Box 1011
Vinita, Oklahoma 74301
Tele: (918) 457-6626
Fax: (918) 517-3431
Email: danajimlaw@gmail.com
Co-Counsel for Plaintiff

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| 1.  RICHARD ADAMSON, | ) | |
| and | ) ) | |
| 2.     BILLY GRAVES | ) ) | |
| Plaintiffs, | ) ) | Case No.   **18-cv-432-CVE-JFJ** |
| v. | ) ) | |
| 1.  UNION PACIFIC RAILROAD, a foreign limited liability company; | ) ) ) ) | Attorney Lien Claimed Jury Trial Demanded |
| and | ) ) | |
| 2.  LLOYD PLYMALE, individually | ) ) ) | |
| Defendants. | ) ) | |

## <u>COMPLAINT</u>

The Plaintiffs Richard Adamson (Adamson) and Billy Graves (Graves) submit their complaint against the Defendants . In support thereof, Plaintiffs allege and state as follows:

1.     Defendant Union Pacific Railroad (UP) is a foreign limited liability company doing business in Oklahoma; including Nowata County.  Upon information and belief UP is a subsidiary of Union Pacific, which is a Nebraska Corporation.

2.     Defendant Lloyd Plymale was a supervisor of UP and engaged in numerous unlawful acts as described below.



3. Plaintiffs were employed with UP in Coffeyville, Kansas.

4. Plymale is citizen of Oklahoma and resides in Nowata County.

5. Venue of this action is proper in this district because both defendants reside in this district and further a substantial part of the events or omissions giving rise to this action occurred in this District.

6. This action arises from the retaliatory conduct of both defendants against plaintiffs for engaging in protected conduct. Specifically, defendants violated two federal acts, the Federal Railway Safety Act and the Family Medical Leave Act, all as discussed below.

### FACTS PERTAINING TO PLAINTIFF ADAMSON

6. Adamson was terminated for obtaining and using gloves, lanterns and a flashlight and his termination and treatment towards him was pretextual and retaliatory.

7. Adamson has been a faithful employee of the UP for over 13 years.

8. Adamson had worked in numerous capacities for the UP, but was eventually assigned to the Coffeyville rail yard.

9. In his early years at Coffeyville, Adamson served under a manager who was steadfast in favor of protecting employees, and ensuring their safety. After his previous manager left, new management arrived and they became more interested in the number of cars that can be processed (a/k/a, velocity), than safety.

10. One manager in particular, Kevin Pratt, has discouraged any hotline reporting of safety measures. Pratt has demanded that safety concerns only be dealt with through

management. Pratt specifically told Adamson not to report safety issues on the hotline, and that it should be handled in house with management.

11. Plaintiff believes that Mr. Pratt has previously been the subject of other OSHA investigations pertaining to safety and retaliatory discharge and also believes UP has faced considerable OSHA sanctions because of Mr. Pratt. Notwithstanding, Pratt continues in UP's employ, continues in a management role, and continues to be charged with ensuring workers are safe in the workplace. Moreover, Pratt continues to blatantly disregard the importance of safety.

12. In this case, consistent with Mr. Pratt's prior behavior, Pratt and his management team have consistently refused to address safety concerns attendant to workplace and worker safety.

13. Specifically, beginning in June of 2015, Adamson and other workers (including Billy Jack Graves) began voicing safety concerns pertaining to safety issues attendant to the railway yard in Coffeyville, KS. There are numerous hazards, all of which were complicated by having to work at night. The safety concerns included:

a. Trip and fall hazards.
b. Snakes.
c. Improper lighting, or no lighting.
d. Lack of safety equipment, "shove lights", lanterns and/or light sticks.

14. The concerns were reported by Adamson via the UP Safety Hotline.

15. The first "discipline" dished out to Adamson by Union Pacific was that he was made to go home early, upon his initial reporting in June of 2015, and thus Adamson lost pay in retaliation for reporting safety issues. From that point forward the work environment

was hostile and toxic. Although management acknowledged to Adamson and others there were safety issues, management refused to improve the safety pertaining to the Coffeyville yard, and the corresponding "SKOL" railway, and specifically the interchange track between the two.

16. At some point after the initial safety hotline reporting, Adamson was subjected to unwarranted disciplinary "coaching" on a matter trumped up by management in retaliation for his reporting of safety concerns.

17. Since June of 2015, Adamson has been subjected to ridicule, harassment and hostility for trying to ensure the safety of him and others.

18.. After a continuous period of harassment and retaliation, on March 10, 2017, Adamson received a Notice of Investigation claiming he had violated Rule 1.6 for dishonesty and for immoral conduct. Specifically, the notice stated:

On 02/17/17, at the location of Coffeyville, KS, at approximately 02:30 hours, while employed as a Switchman it is alleged you engaged in dishonest an immoral conduct when, without authorization you entered a Union Pacific storage room and illegally removed company equipment/materials. An appropriate company officer became aware of your alleged misconduct on 03/03/17 when reviewing video/camera footage from the Coffeyville Yard Offices.

19. A so-called investigation was nothing more than a kangaroo court run by one of Adamson's managers who had ridiculed him for bringing up safety concerns. The only UP witness, Defendant Plymale, is also in UP management as a Manager of Operating Practices (MOP). Billy Jack Graves and Adamson were, in essence, tried at the same hearing together. Mr. Graves had insisted Plymale walk the SKOL railway interchange with him, and showed Plymale the safety hazards at issue, which Plymale recognized,

admitted there were unsafe conditions, yet did nothing to rectify them. To clarify, the SKOL railway is a system of tracks which is really nothing but a trip and fall hazard, the walk paths containing rotten and/or missing ties, broken angle bars, trees overhanging the walking area and/or fallen down upon the ground, large rocks, and holes and dips in ballast area. Mr. Graves also has shown the area to previous management at the UP, to no avail. Mr. Adamson has also voiced concerns in regards to safety at the SKOL to management many times previously, and has actually shown his concerns to management personally.

20.     Adamson was terminated allegedly for entering a safety supply closet with Billy Jack Graves, the Footboard Yardmaster who had been issued a key to this closet, and wherein Mr. Adamson obtained two magnetic based lanterns, gloves and a light stick. Mr. Adamson also had his own key to the safety supply closet, which had been issued to him previously by UP management.

21.     Stated otherwise, Mr. Adamson was fired for obtaining and using safety supplies from a safety supply closet he had full access to. Really, Mr. Adamson was retaliated against for his past reporting of safety hazards, as well as his use of said safety equipment and assertion of his legal rights.

22.     Adamson was terminated during the pendency of his intermittent leave.

23.     Mr. Adamson and co-worker Billy Jack Graves entered a "safety supply closet" (not a storage room) in order to obtain safety equipment consisting of, cumulatively, lanterns, gloves and lights sticks. The lanterns, which had magnetic bottoms, were

used as shove lights, and this was done because UP was not providing shove lights required by Wichita Superintendent Bulletin No. -30".

24.     On page 6 of the Bulletin it is clear shove lights were to be provided, but again, it is beyond question that they were not.  Mr. Graves and Mr. Adamson improvised in using magnetic lanterns to enhance their safety, and the safety of others.

25.     Superintendent Bulletin #30 which states, in the last sentence of the first paragraph of Section B: "Use extreme caution and make sure all cars are stopped in the track you are walking beside." It had been previously discussed with management, and among the workers, that employees should not have to walk besides moving cars, especially at night.   Mr. Graves brought to the attention of management the fact that workers were being made to walk near moving trains, at night, which greatly increased the danger.  Adamson expressed the same concerns to management.  The reaction has been consistent with Mendoza's statement to Mr. Graves, and Mr. Adamson, that "we have all worked at night before, go do your damned job."

26. There was a camera in the safety supply closet at issue. However, it is clear Mr. Graves and Mr. Adamson knew it was there.  It is clear they were not there to steal from the company.  As aforementioned, Mr. Adamson took a light stick, gloves and two lanterns to further enhance his safety, and the safety of others, while working along dark tracks at night.

27.     In taking safety equipment, he did so by placing them in his coveralls, and left the safety supply closet with the equipment concealed so that a crew from Kansas City would not bother him to obtain safety supplies from the room.  Adamson reported to Mr.

DeGroot that Adamson and Graves had taken safety equipment from the closet, and same was not unusual. Management made much of the concealment, notwithstanding that the safety equipment was concealed. **It is undisputed the safety equipment was used for company purposes and never left company property.**

28. The hearing record clearly established Mr. Adamson was issued his own key to the safety supply closet by former manager Ted Johnston, and thus had his own, independent, right to be there. The record also clearly established, by and through two workers who independently had 40+ years of experience at UP, that it was common practice to issue the Footboard Yardmaster a key to the safety supply closet, this so that he would not have to call management in the middle of the night to obtain safety supplies. Mr. Adamson had been the Footboard Yard Master previously, but elected to take a Switchman position because of the timing of his days off. At the time of his termination, Mr. Adamson had Footboard Yardmaster status, and seniority, but elected to work as a Switchman. No evidence was presented stating that Mr. Adamson was banished from the safety supply closet. In addition, he entered the safety supply closet with the acting and actual Footboard Yardmaster, same being Mr. Graves.

29. No credible witness was called which could state Mr. Adamson did not have the authority to access the safety supply closet, possess a key, or enter with the acting Footboard Yardmaster. In fact, there were several UP witnesses which UP failed to produce, and one must wonder why, other than they either did not want to perjure themselves, or did not want to testify against management.

30.    The sole and only witness for the UP was the charging manager, MOP Plymale, who testified there was no written policy stating Mr. Adamson could not enter the safety supply closet, and no policy stating Mr. Graves, the Footboard Yardmaster, could not use a key issued to him for access to the safety supply closet, or allow Adamson to accompany him.  The finding of a termination based upon this information alone reeks of retaliation.

31.    Mr. Adamson's Union Representative, Shawn Rowe (who admirably represented Mr. Adamson and Mr. Graves at the same hearing, at the same time), intended to call an employee witness that also had a key to the safety supply closet.  However, Mr. Rowe was told by Plymale the employee would be pulled out of service and disciplined should he be called as a witness.  The employee in question was close to retirement, and none of parties wished to see him disciplined, and so he was not called.  This is yet another bullying and retaliation tactic to deny Mr. Adamson a valuable witness, as to the importance of the use of safety equipment, and proof that keys are made available to employees other than management to the safety supply closet is evident.

32.    In December of 2017, Adamson via his Union grievance won his appeal of his termination and was reinstated.  However, Adamson was not awarded back-pay.  Upon reinstatement,  UP continued to retaliate against Adamson by not crediting him with hours worked during his time off work from the unlawful termination until reinstatement.  This has resulted in loss or diminished benefits. The retaliation continues to this day as UP selectively enforces its policies against Adamson while at the same time not enforcing its policies as to other employee.

## FACTS PERTAINING TO GRAVES

33.    Graves alleges the above facts.  Additionally, Graves alleges:

34.    Mr. Graves has been a faithful employee of the Union Pacific Railroad for over 9 years.  Mr. Graves had worked in numerous capacities for the UP, but was eventually assigned to the Coffeyville rail yard.

35.  Specifically, beginning in June of 2015, Mr. Graves and other workers (including Richard Adamson,) began voicing safety concerns pertaining to safety issues attendant to the railway yard he worked in, same being Coffeyville, KS.  There are numerous hazards, all of which were complicated by having to work at night.  The safety concerns included:

a.  Trip and fall hazards.
b.  Snakes.
c.  Improper lighting, or no lighting.
d.  Lack of safety equipment, "shove lights", lanterns and/or light sticks.

36.    The concerns were reported by Graves via the UP Safety Hotline.  Mr. Graves was told by UP management not to use the Safety Hotline, and to report concerns directly to management.

37.    The first "discipline" dished out to Mr. Graves by UP was that he was made to go home early, upon his initial reporting in June of 2015, and thus Graves lost pay - all this in retaliation for reporting safety issues.  From that point forward the work environment was hostile and toxic.  Although management acknowledged to Mr. Graves and others there were safety issues, management refused to improve the safety pertaining to the

Coffeyville yard, and the corresponding "SKOL" railway, and specifically the interchange track between the two.

38.     Approximately six months or so after the initial safety hotline reporting, Mr. Graves was subject to disciplinary "coaching" for what management alleged was the improper picking up the interchange in the computer system.  The coaching was not warranted, was inconsistent with common practice, and Mr. Graves did not sign off on the coaching session.  In fact, he wrote a protest and submitted it to management.

39.     Since June of 2015, Mr. Graves, a Footboard Yardmaster, has been instructed by management (specifically hearing officer Mendoza) to short circuit job briefings, a required event in order to properly prepare safety plans and for management of the day's events.  Mr. Graves was also subjected to ridicule and hostility for trying to ensure he and his crew could work safely.

40.     On March 10, 2017, Mr. Graves received a Notice of Investigation claiming he had violated Rule 1.6 for dishonesty and for immoral conduct.  Specifically, the notice stated:


On 02/17/17, at the location of Coffeyville, KS, at approximately 02:30 hours, while employed as a Footboard Yardmaster it is alleged you engaged in dishonest and immoral conduct when, without authorization you entered a Union Pacific storage room and illegally removed company equipment/materials.  An appropriate company officer became aware of your alleged misconduct on 03/03/17 when reviewing video/camera footage from the Coffeyville Yard Offices.


41.     The record is clear the so-called investigation was nothing more than a kangaroo court run by one of Mr. Graves managers (Mendoza) who had ridiculed him for correctly

completing job briefings, which include safety plans. The only UP witness, Lloyd Plymale, is also in UP management as a Manager of Operating Practices (MOP). Note here, that Mr. Graves had insisted Plymale walk the SKOL railway interchange with him, and showed Plymale the safety hazards at issue, which Plymale recognized, admitted there were unsafe conditions, yet did nothing to rectify them. To clarify, the SKOL railway is a system of tracks which is really nothing but a trip and fall hazard, the walk paths containing rotten and/or missing ties, broken angle bars, trees overhanging the walking area and/or fallen down upon the ground, large rocks, and holes and dips in ballast area. Mr. Graves also has shown the area to previous management at the UP, to no avail.

42.     Graves was terminated for using a key issued to him to access a safety supply closet and obtain and use safety equipment, same consisting of a light stick. Stated otherwise, **Mr. Graves was fired for getting and using a flashlight to enhance his safety.** Really, Mr. Graves was retaliated against for his past reporting of safety hazards, as well as his use of safety equipment, and issuance of safety equipment to Richard Adamson. Retaliation, indeed.

43.     Graves and co-worker Adamson entered a "safety supply closet" (not a storage room) in order to obtain safety equipment consisting of, cumulatively, lanterns, gloves and lights sticks. The record is clear that the lanterns, which had magnetic bottoms, were used as shove lights.

44.     UP was not providing shove lights required by Wichita Superintendent Bulletin No. -30". . On page 6 of the Bulletin it is clear shove lights were to be provided, but

again, it is beyond question that they were not. Mr. Graves and Mr. Adamson improvised in using magnetic lanterns to enhance their safety, and the safety of others.

45. Superintendent Bulletin #30 which states, in the last sentence of the first paragraph of Section B: :"Use extreme caution and make sure all cars are stopped in the track you are walking beside."

46. It has been discussed with management, and among the workers, that employees should not have to walk beside moving cars, especially at night. This is yet another safety concern which Mr. Graves is being retaliated against for bringing to management's attention. The reaction has been consistent with Mr. Mendoza's statement to Mr. Graves that "we have all worked at night before, go do your damned job."

47. There was a camera in the safety supply closet at issue. However, it is clear Mr. Graves and Mr. Adamson knew it was there. As aforementioned, Mr. Graves took a light stick to further enhance his safety working along dark tracks at night. In taking the light stick, he did so by placing it in his vest, in view of the camera, and left the safety supply closet with it concealed so that a crew from Kansas City would not bother him to obtain safety supplies from the room. Management made much of the concealment, albeit the record is clear why the light stick was concealed. Also, the record is clear the light stick was used for company purposes and **never left company property.** The record is clear that the light stick was stored in Mr. Graves' desk, that Mendoza (again, the hearing officer) took it out of his desk, and that Lloyd Plymale re-issued Graves a

light stick the next shift. Graves was told by Plymale it was the exact, same light stick that was taken from his desk.

48.     Graves was issued a key to the safety supply closet, and he and Mr. Adamson had reported to management that they had entered the closet and taken safety equipment.   The record also clearly established, by and through two workers who independently had 40+ years of experience at UP, that it was common practice to issue the Footboard Yardmaster a key to the safety supply closet, this so that he would not have to call management in the middle of the night to obtain safety supplies.   No credible witness was called which could state Mr. Graves did not have a right to the key nor the right to access the safety supply closet.   In fact, there were several UP witnesses which UP failed to produce, and one must wonder why, other than they either did not want to perjure themselves, or did not want to testify against management.

49.     The sole and only witness for the UP was the charging manager, MOP Plymale, who testified there was no written policy stating Mr. Graves could not enter the safety supply closet, and no policy stating Mr. Graves could not use a key issued to him for access to the safety supply closet.   That the finding of a termination based upon this information alone reeks of retaliation.

50.     Mr. Graves' Union Representative, Shawn Rowe, intended to call an employee witness that also had a key to the safety supply closet.  However, Mr. Rowe was told by Plymale the employee would be pulled out of service and disciplined should he be called as a witness.  The employee in question was close to retirement, and none of parties wished to see him disciplined, and so he was not called.  This is yet another

bullying tactic to deny Mr. Graves a valuable witness, as to the importance of the use of safety equipment, and proof that keys are made available to employees other than management to the safety supply closet. To this end, Richard Adamson has a key to the safety supply closet, and was issued same a long time ago.

51.     One disturbing fact in the hearing is Mr. Plymale wrongfully accused Mr. Graves of threatening Plymale as for his career and his family. Mr. Plymale's assertion is false and retaliatory. It is common practice for UP management to begin accusing employees of making threats in conjunction with employment disciplinary actions.

52.  In December of 2017, Graves was reinstated via his Union appeal process. However, he was not awarded back-pay. Further, UP continues to retaliate by miscalculating his service and benefits time. Graves has been denied FMLA because he has not worked the requisite hours in the last year to have accrued it, yet the reason he had not accrued such time was the unlawful termination by UP. As a result, Graves does not have vacation or FMLA leave since he did not work 1,250 hours for the year. Graves last used FMLA in February 2017, shortly before the Notice of Investigation submitted by defendants. Nevertheless, despite not using all FMLA he was entitled too, he now has none available. Further, retaliation when Plymale falsely stated to others that Graves threatened him and his family which resulted in Graves being contacted by the UP security and questioned by them. UP continues to selectively enforce its policies as to Graves.

## FEDERAL RAILROAD SAFETY ACT, 49 U.S.C. § 20101 et. seq., (FRSA)-AS TO DEFENDANT UP

Plaintiffs restate and re-allege the foregoing as though fully set forth herein. Additionally, Plaintiffs allege:

53.     The FRSA prohibits a railroad from discriminating against employees for notifying or attempting to notify the railroad or the Secretary of Labor of a "work-related personal injury or work-related illness[.]" 49 U.S.C. § 20109(a)(4).

54.     An employee who believes that he has been discriminated against in violation of this provision can seek relief by filing an administrative complaint with the Secretary of Labor. 49 U.S.C. § 20109(d)(1). The FRSA also allows the employee to pursue an action in federal court if the Secretary does not decide the case within 210 days. This part of the FRSA, called the "kick out" provision, 49 U.S.C. § 20109(d)(3).

55.     Prior to filing this action, Plaintiffs fully exhausted their administrative remedies under FRSA.  Specifically, 210 days has elapsed and thus the "kick out" provision is applicable.

56.     Plaintiffs engaged in protected conduct under FRSA by notifying UP as well as the hotline of the safety hazards described above. Graves has been denied FMLA because he has not worked the requisite hours in the last year to have accrued it, yet the reason he had not accrued such time was the unlawful termination by UP.  As a result, Graves does not have vacation or FMLA leave since he did not work 1,250 hours for the year. Graves last used FMLA in February 2017, shortly before the Notice of Investigation submitted by defendants.  Nevertheless, despite not using all FMLA he was entitled too, he now has none available. Further, retaliation when Plymale falsely

stated to others that Graves threatened him and his family which resulted in Graves being contacted by the UP security and questioned by them.

57. Defendant UP, retaliated against Plaintiffs as set forth above.

58. As a result of UP's conduct, plaintiffs have sustained actual damages in excess of $10,000.

59. UP has acted intentionally with malice in a willful matter and as such punitive damages should be assessed.

60. Liquidated and/or treble damages should be assessed to the extent applicable.

61. Plaintiffs should be reimbursed reasonable attorney fees and costs.

### FMLA INTERFERENCE-AS TO DEFENDANTS UP AND PLYMALE

Plaintiffs restate and re-allege the foregoing as though fully set forth herein. Additionally, Plaintiffs allege:

62. During the period described above, Adamson also availed his rights under the Family and Medical Leave Act in several respects.

63. That UP is a qualified employer under the Family and Medical Leave Act of 1993, 20 U.S.C., § 2601-2654 et. seq. (FMLA). Specifically, UP has in excess of 50 employees and Adamson had worked there in excess of one year.

64. That UP and Plymle are employers within the FMLA and Plymale is individually liable both as an employer and a person

65.     That in October of 2016 Adamson requested and received FMLA. The leave was intermittent as necessary to transport Adamson's father (now deceased) for necessary treatment for his bladder cancer and also to take care of his daily needs.

66.     Defendants retaliated against and interfered with Adamson's rights under the FMLA as described herein. Further, Plymale falsely accused Adamson of making racist comments in a deliberate attempt to intimidate him by admonishing him for statements attributed by Adamson when Plymle was aware that statements were not made by Adamson. Such false admonishment occurred after the assertion of Adamson's FMLA rights and during his intermittent leave approval. Such conduct also constitutes interference.

67.     During the time described herein, Graves also asserted his FMLA rights by requesting and receiving intermittent FMLA for medical condition for his wife, specifically severe migraines. He requested and received such leave in 2015 and 2016 year. At the time of his unlawful termination, Graves was still eligible for and still used his intermittent leave. Kevin Pratt, a supervisor of UP, told another employee that FMLA was a cancer and UP was going to cut it out.

68.     Defendants retaliated against Graves by terminating him while his intermittent FMLA was still being used. Such conduct also constitutes interference. Further, he was retaliated against when he was falsely accused of stealing necessary equipment used for safety. Incredulously, defendants retaliated against Graves during his Union grievance when at a conference room at the hearing location Plymle confronted Graves and asked if he had a problem and accused him of "cutting eyes" at him.

69.  Both Plaintiffs availed themselves of their rights within the FMLA.

70.  Defendants interfered with Plaintiffs' FMLA rights by retaliating against him on numerous respects and terminating them.

71.  As a result of Defendants' conduct, Plaintiff has sustained actual damages in excess of $10,000.00.

72.  Plaintiffs should be awarded a reasonable amount of attorney fees and costs herein.

73.  Liquidated and/or treble damages should issue against Defendants.

### FMLA RETALIATION-AS TO DEFENDANT UP AND PLYMALE

Plaintiff hereby adopts, realleges and incorporates by reference the allegations contained in the foregoing paragraphs.

74.  Defendants retaliated against Plaintiffs for availment of their rights under the FMLA and other legal rights as set forth above.

75.  That Plaintiffs' availment of their rights was a significant motivating factor in Defendants' conduct towards Plaintiffs.

76.  That Defendants have acted maliciously and willfully and as such liquidated damages should be assessed against Defendants.

77.  As a result of Defendants' conduct, Plaintiff has sustained actual damages in excess of $10,000.00.

78.  Plaintiffs should be awarded a reasonable amount of attorney fees and costs.

WHEREFORE, for all of the foregoing reasons, Plaintiffs respectfully requests an award of actual damages in excess of $75,000.00, an award of punitive damages in excess of

$10,000.00, all costs of this action, and for any and further relief this Court deems just and proper.

S/Brendan M. McHugh
Brendan M. McHugh, OBA #18422
Co-Counsel for Plaintiff
PO Box 1392
Claremore, OK 74018
(918) 608-0111
Fax: (918) 803-4910

**UNION PACIFIC RAILROAD**
1400 Douglas Street STOP 0710
Omaha, Nebraska 68179-0710

Mitch McClure
(402) 544-6201
mwmcclur@up.com

July 11, 2019

Subject Code: 1.6

| Carrier File No. | Organization File | Name | Employee ID | Incident Date(s) | Discipline Level |
|---|---|---|---|---|---|
| 1722014 | DF-19-081-0527 | Graves, BJ | 0435016 | 04/08/2019 | Dismissal |

T. L. DIXON
GENERAL CHAIRMAN SMART-TD 569
12200 NW AMBASSADOR DRIVE STE 236
KANSAS CITY, MISSOURI 64163

Dear Sir:

This refers to the permanent dismissal of the above named Claimant for violation of General Code of Operating Rule(s) 1.6 [Conduct/Careless/Negligent/Dishonest], 7.1 [Switching Safely and Efficiently] following a Hearing held in Pryor, OK on April 24, 2019. Notwithstanding, and after careful and extensive consideration of this case, the Carrier is willing to offer Trainman Graves a conditional reinstatement under the following conditions:

1. Trainman Graves waives any further appeal of this case, acknowledges responsibility for his actions, and accepts the proposed discipline.

2. Prior to exercising his seniority, Trainman Graves will be required to complete, any and all rules and/or physical examination requirements as well as any FRA certification requirements.

3. Prior to exercising his seniority, Trainman Graves will also be required to meet with the General Superintendent Kelli Dunn, Heartland Service Unit [or her designee].

4. Trainman Graves will return to service with seniority rights and vacation rights restored while out of service. No claim may be filed by or on behalf of Trainman Graves regarding this incident, and any and all claims already filed are considered withdrawn and dismissed in their entirety. Furthermore, any claims pending on behalf of concerning any other discipline or attendance policy violations which occurred prior to the date of this agreement are also considered withdrawn.

5. Upon his return to active service, Trainman Graves's discipline status will be recorded as a MAPS Training 1 with a 36 month retention period commencing with the first date he performs compensated service.

6. If at any time during the 36 month retention period, he is charged with a violation of the General Code of Operating Rules, Air Brake and Train Handling Rules, or System

1



**UNION PACIFIC RAILROAD**
1400 Douglas Street STOP 0710
Omaha, Nebraska 68179-0710

Mitch McClure
(402) 544-6201
mwmcclur@up.com

Special Instructions he will be handled in accordance with the Carrier's MAPS Policy and the Discipline Agreement between the parties.

7. Trainman Graves understands and concurs that compliance with all Company Rules, Regulations, and Policies is a condition of continued employment and this reinstatement in no way diminishes the severity of the incident for which charged.

8. It is understood that this agreement is on a non-precedent basis and shall not be cited in any manner in the handling of any other case except as it relates to Trainman Graves. It is also understood, any other decision or award rendered by, but not limited to, a Board of Arbitration will not alter the terms and conditions of this agreement.

Finally, through his signature, Trainman Graves stipulates that he has entered into this agreement with full knowledge and understanding of its terms and conditions. Trainman Graves further acknowledges he has discussed this agreement with her Representative. Concurrently, Trainman Graves releases the Carrier and the Organization and its officers from any liability and/or responsibility in connection with not progressing, any claims on his behalf that would otherwise arise from this incident.

Please signify your concurrence with this Agreement in the space provided below. If you do not accept this offer within five (5) calendar days from the date of this letter, then it is withdrawn in its entirety and the matter will be handled in accordance with the terms and conditions of the Discipline Agreement between the parties.

Respectfully,

*Mitch W. McClure* [For: Rebecca Cates]

Mitch W. McClure
UPRR, Labor Relations

I concur:

_____          _____
Bill J. Graves, Employee ID 0435016          Date

Agreed:

_____          _____
T. L. Dixon, General Chairman SMART-TD 569          Date

2